**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF NEW YORK**

RAYMOND SPRINKLER, individually and on behalf of all others similarly situated,

*Plaintiff*,

v.

SUN RIVER HEALTH, INC., a New York corporation; COMMUNITY HEALTH ACTION OF STATEN ISLAND, INC., a New York corporation; DOES 1 through 10, inclusive,

*Defendants*.

Case No.

**CLASS ACTION COMPLAINT**

1. Negligence
2. Breach of Implied Contract
3. Unjust Enrichment/Quasi-Contract
4. Invasion of Privacy
5. Violation of New York Gen. Bus. Law § 349
6. Violation of New York Gen. Bus. Law § 350
7. Violation of New York Public Health Law Article 27-F

**DEMAND FOR JURY TRIAL**

Plaintiff Raymond Sprinkler ("Plaintiff"), individually and on behalf of all others similarly situated ("Class Members"), brings this action against Defendants Sun River Health, Inc. ("Sun River"), Community Health Action of Staten Island, Inc. ("CHASI"), and Does 1 through 10, inclusive ("Defendants"), based upon Plaintiff's personal knowledge as to himself and his own acts, and, as to all other matters, upon investigation by counsel.

## NATURE OF THE ACTION

1. Plaintiff brings this class action against Defendants arising from a data breach that compromised the sensitive personal and protected health information of Plaintiff and Class Members.

2. Sun River is a New York-based healthcare organization that publicly holds itself out as responsible for compliance, patient confidentiality, and HIPAA-governed privacy practices across its network, including CHASI, which Sun River identifies as part of the Sun River Health network. Sun River's public Notice of Privacy Practices further states that Sun River Health is an organized health care arrangement consisting of Sun River Health, Brightpoint Care, and Community Health Action of Staten Island.

3. In order to obtain healthcare and related services from Defendants, Plaintiff and Class Members were required to provide highly sensitive personally identifiable information ("PII") and protected health information ("PHI") (together, "Private Information"). Defendants collected, aggregated, and stored this Private Information in the ordinary course of their operations.

4. According to the organization's incident notice, unauthorized actors accessed CHASI's network between October 31, 2025 and January 5, 2026. The intrusion was discovered on January 5, 2026. The exposed and stolen information included individuals' names, addresses, personally identifiable information and protected health information such as individuals' names, Social Security numbers, driver's license or non-driver identification numbers, bank account and routing numbers, medical information, (including HIV test records), and health insurance information. Notification letters began on March 6, 2026.

5. This was not a momentary security event. By Sun River's own chronology, unauthorized actors remained in the affected environment for more than two months before detection. A healthcare entity exercising reasonable care with respect to systems containing protected health information does not permit unauthorized access to persist from October 31, 2025 until January 5, 2026 without serious failures in its security program.

6. The breach therefore reflects not merely the existence of a criminal attack, but the failure of the security controls that were supposed to prevent, detect, limit, and contain unauthorized access to systems storing sensitive patient information.

7. As a direct result of Sun River's conduct, Plaintiff's and Class Members' private information was exposed to unauthorized actors, depriving them of the privacy and security that Sun River was obligated to provide and materially increasing their risk of medical privacy harms, medical identity theft, targeted fraud, and other misuse of their information.

8. Plaintiff seeks damages, restitution, declaratory relief, injunctive relief, and all other relief available at law or in equity.

## THE PARTIES

9. Plaintiff is a resident of New York and was a patient of CHASI and/or Sun River. In order to obtain care and related services, Plaintiff provided highly sensitive personal and health information to Defendants and their network.

10. As a result of the Data Breach, Plaintiff has been subjected to a substantial, present, and imminent risk of identity theft, financial fraud, medical identity theft, and insurance-related fraud because the compromised information includes Social Security numbers, bank account and routing numbers, medical information (including HIV test records), and health insurance information. In response to that risk, Plaintiff has spent time dealing with the consequences of the Data Breach, including verifying the legitimacy and impact of the incident, reviewing available credit monitoring and identity theft protection services, monitoring financial and other accounts, and seeking to mitigate the risk of misuse of his information. This time has been lost and cannot be recovered.

11. Plaintiff has suffered actual injury in the form of the loss of privacy in and loss of control over his Private Information, including Social Security number, financial account information, medical information, and health insurance information. Plaintiff has also suffered injury in the form of the diminution in value of that Private Information, which constitutes a valuable form of personal property that was compromised as a direct result of the Data Breach. Plaintiff has further suffered injury in the form of a substantial and significant increase in the imminent risk of identity theft, financial fraud, medical identity theft, insurance fraud, and other misuse of his information because the Data Breach exposed extraordinarily sensitive personal, financial, and medical information to criminal actors motivated to obtain illegal profits through the theft, sale, misuse, and extortionate exploitation of stolen data. In addition, Plaintiff has suffered injury in the form of lost time and resources spent responding to the Data Breach, including time spent reviewing breach notifications, assessing the scope and implications of the compromise, monitoring financial and personal accounts, evaluating credit monitoring and identity protection services, and taking reasonable steps to detect and mitigate potential misuse of his Private Information. Further, the sensitive information was placed for sale on the Dark Web.

12. Plaintiff also suffered actual economic injury in the form of the loss of the benefit of his bargain with Defendants and the overpayment for healthcare and related services. Plaintiff paid for services with the reasonable understanding that those services would be provided in a manner that included lawful, reasonable, and adequate protection of the extraordinarily sensitive personal, financial, and medical information Defendants required him to disclose as a condition of receiving care. The value of that bargain is measured by the difference between: (a) the value of the services as represented and reasonably expected, which included reasonable and adequate data-security safeguards; and (b) the value of the services actually received, which were worth less because Defendants failed to provide those safeguards and instead exposed Plaintiff's Private Information to unauthorized access, acquisition, and exfiltration. Plaintiff would not have paid the amount he paid, or would have paid less, had he known Defendants would fail to reasonably safeguard his Private Information.

13. Sun River is a New York not-for-profit corporation organized under the laws of the State of New York, with a principal office located at 1037 Main Street, Peekskill, New York 10566. Sun River operates a network of healthcare providers and affiliated organizations, including CHASI, which Sun River publicly represents is part of the Sun River Health network. Sun River holds itself out as responsible for compliance, privacy, and security across its healthcare network and publicly represents that its compliance program is designed to ensure adherence to federal, state, and local healthcare laws and regulations, including obligations relating to patient privacy and the protection of sensitive health information.

14. Sun River's own Notice of Privacy Practices states that Sun River Health is an organized health care arrangement consisting of Sun River Health as the parent company, Brightpoint Care, and Community Health Action of Staten Island. That same notice states that Sun River must collect, create, and maintain health information about patients and is required by law to maintain the privacy of that information.

15. At all relevant times, Sun River exercised sufficient control over the collection, maintenance, safeguarding, privacy practices, compliance functions, and use of Plaintiff's and Class Members' private information to be liable for the acts and omissions alleged herein.

16. CHASI is a New York corporation with its principal place of business at 56 Bay Street, 6th Floor, Staten Island, New York 10301. CHASI provided healthcare and related services to Plaintiff and Class Members, directly collected and maintained their Private Information, and was part of the network and organized health care arrangement through which Sun River and CHASI collected, stored, safeguarded, and used Plaintiff's and Class Members' Private Information.

17. The true names and/or capacities, whether individual, corporate, partnership, associate or otherwise, of the Defendants herein designated as Does 1 to 10 are unknown to or presently being investigated by Plaintiff at this time, and Plaintiff, therefore, sues said Defendants such fictitious names. Plaintiff alleges that each named Defendant herein designated as a Doe party is negligently, willfully, or otherwise legally responsible for the events and happenings herein referred to and proximately caused damages to Plaintiff, as herein alleged. Plaintiff will

seek leave of Court to amend this Complaint to insert the true names and capacities of such Defendants when they have been ascertained and will further seek leave to join said Defendants in these proceedings.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) and (d)(5)(B) because this is a class action in which the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, the proposed Classes consist of at least 100 members, and at least one Class Member is a citizen of a state different from at least one Defendant.

19. The breach was later disclosed to the Massachusetts Office of Consumer Affairs and Business Regulation on February 24, 2026, with official notification indicating that at least two Massachusetts residents were affected.

20. This Court has personal jurisdiction over Defendants because each Defendant is organized under the laws of the State of New York, conducts substantial business within this District, and purposefully avails itself of the privilege of conducting activities in this District. Defendants provide healthcare and related services to residents of this District, including Plaintiff, and the events and omissions giving rise to Plaintiff's claims, including the collection, storage, and compromise of Plaintiff's and Class Members' Private Information, occurred in substantial part within this District.

21. Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or omissions giving rise to these claims occurred in this District, including the provision of healthcare and related services in Staten Island, and because Sun River does business in this District.

## FACTUAL ALLEGATIONS

### A. Sun River And CHASI Collected and Maintained Highly Sensitive Information

22. In the ordinary course of providing healthcare and related services, Sun River and its CHASI operations collected and maintained highly sensitive information belonging to Plaintiff and Class Members.

23. The information compromised in the breach included, at minimum, personally identifiable information and protected health information such as individuals' names, Social Security numbers, driver's license or non-driver identification numbers, bank account and routing numbers, medical information (including HIV test records), and health insurance information.

24. This combination of identifiers and financial information is among the most sensitive categories of data maintained by healthcare organizations. Social Security numbers, government identification numbers, and banking information are permanent identifiers that can be used to commit identity theft, financial fraud, tax fraud, and medical identity theft.

25. The exposure of Social Security numbers, financial account information, and medical data creates a uniquely severe risk of identity theft and fraud because these identifiers are widely used to verify identity in financial, healthcare, and government systems. Unlike passwords or credit card numbers, Social Security numbers and medical histories cannot be changed once compromised, meaning victims face a lifetime risk of misuse.

26. In recognition of the severe and significantly increased risk of identity theft and fraud resulting from the exposure of highly sensitive information, including Social Security numbers and financial account information, Defendants offered affected individuals two years of credit monitoring and identity theft protection services. Defendants' decision to provide credit monitoring and identity theft protection services is itself an acknowledgment that the compromised information places victims at a substantial and imminent risk of identity theft and financial fraud. Such services are offered only where a company recognizes that the exposed information can be used to commit identity theft or other fraudulent activity.

27. The Data Breach exposed Plaintiff's and Class Members' Social Security numbers, bank account and routing numbers, medical information (including HIV test records), and health insurance information, precisely the types of data that create a substantial, present, and imminent risk of identity theft, financial fraud, medical identity theft, and insurance-related fraud. This is not a case involving only names or contact information. The compromised data includes permanent identity markers and financial account information that can be used immediately to impersonate victims, access or misuse financial resources, open fraudulent accounts, submit false

claims, obtain medical services, or engage in other forms of identity-based fraud. Because Social Security numbers and medical information cannot meaningfully be changed once exposed, and because bank-account information creates an immediate threat of misuse, Plaintiff and Class Members face a real and ongoing risk of harm that is concrete, particularized, and imminent. Defendants' decision to offer two years of credit monitoring and identity theft protection further confirms the seriousness of that risk.

**B. The Data Breach and Defendants' Failure to Provide Reasonable, Adequate and Compliant Data Security as Promised**

28. Defendants disclosed that unauthorized actors gained access to CHASI's network between **October 31, 2025 and January 5, 2026**, and that the intrusion was not discovered until January 5, 2026. For over two months, sophisticated criminals had unmonitored, unfettered, free and total access to patients' most sensitive data that was in Defendants' possession. Defendants further disclosed that the incident involved highly sensitive personal and medical information, including names and one or more of the following: Social Security numbers, driver's license or non-driver identification card numbers, bank account and routing numbers, medical information, and health insurance information.

29. The duration of the intrusion, as disclosed by Defendants, demonstrates that criminal actors remained in Defendants' environment for more than two months before detection. A healthcare entity exercising reasonable care with respect to systems containing Social Security numbers, financial account information, medical information, and health insurance information does not permit unauthorized access to persist for that length of time without serious deficiencies in its cybersecurity safeguards, monitoring, alerting, access controls, containment measures, or some combination thereof.

30. Defendants failed to implement and maintain cybersecurity measures reasonably designed to prevent unauthorized access to systems containing Plaintiff's and Class Members' Private Information, to timely detect unauthorized access once it occurred, and to promptly contain and remediate the intrusion before highly sensitive data was exposed.

31. Defendants failed to maintain a security program commensurate with the sensitivity of the information they collected and stored. The compromised information included permanent identity markers, government-issued identification data, banking information, medical information, and health insurance information, precisely the categories of data that require heightened administrative, technical, and physical safeguards because they create a substantial risk of identity theft, financial fraud, medical identity theft, and insurance fraud if exposed.

32. The attackers accessed and exfiltrated, at least, 200,000 files containing patient medical and personal information from Defendants' systems. The compromised files reportedly contained highly sensitive personal and medical information, including Social Security numbers, driver's license numbers, bank account and routing numbers, medical records, and health insurance information.[1]

33. Public cybersecurity reporting further indicates that the incident was associated with a ransomware attack attributed to the GENESIS ransomware group, which claimed responsibility for breaching CHASI's systems and exfiltrating sensitive data from Defendants' network environment.

34. Ransomware and data theft is typically, but not always, accomplished through phishing, malicious links, or compromised remote desktop protocols. It is also "highly preventable"[2] through the implementation of reasonable and adequate data security procedures, such as using reputable security software, maintaining software updates, maintaining data backups, and proper employee cybersecurity training. The fact that the Data Breach was caused by criminal actors confirms that Defendants failed to implement reasonable and adequate data security safeguards.

---

[1] UpGuard, *Data breach reported for Community Health Action of Staten Island*, https://www.upguard.com/news/chasi-data-breach-2026-02-26 (last visited Mar. 9, 2026).

[2] Dr. Alan Shark, *Ransomware – Both Terrible and Preventable*, NACo (May 30, 2017), https://www.naco.org/articles/ransomware-%E2%80%94-both-terrible-and-preventable#:~:text=This%20ransomware%20threat%20is%20also,better%20than%20any%20shortsighted%20punishment (last visited Feb. 24, 2026).

35. The Data Breach occurred as a result of Defendants' failure to implement reasonable, adequate and compliant data security to protect its members' Private Information. Had Defendants not failed to implement such data security, the Data Breach would not have occurred. It was the foreseeable result of Defendants' failure to implement and maintain cybersecurity safeguards reasonably commensurate with the volume, sensitivity, and foreseeable criminal value of the Private Information they collected and stored, including Social Security numbers, driver's license or non-driver identification numbers, bank account and routing numbers, medical information, including HIV test records, and health insurance information.

36. Defendants failed to implement and enforce reasonable identity and access management controls. The successful compromise of systems containing Social Security numbers, financial account information, medical information, and health insurance information supports the inference that Defendants failed to adequately restrict, authenticate, and monitor access to systems and accounts capable of reaching such data, including by failing to sufficiently limit privileges, failing to adequately govern administrative access, and failing to ensure that sensitive systems were accessible only to authorized users with a legitimate business need.

37. Defendants failed to provide, enforce, and maintain reasonable cybersecurity training for employees and workforce members with access to sensitive systems and Private Information. Given the well-known threat of phishing, credential theft, account compromise, and ransomware in the healthcare sector, reasonable entities handling Social Security numbers, banking information, medical information, and health insurance information train personnel to recognize, prevent, escalate, and respond to suspicious activity. The occurrence, success, and prolonged duration of the intrusion support the inference that Defendants' workforce cybersecurity training was materially inadequate.

38. Defendants failed to secure internet-facing systems and remote-access pathways used to access their environment. In a healthcare enterprise handling highly sensitive patient and financial information, reasonable cybersecurity requires hardening and timely remediation of externally exposed systems, including remote access services, gateways, web-facing assets, and other points of entry commonly targeted by threat actors. The fact that attackers were able to

penetrate Defendants' environment and remain there undetected for an extended period supports the inference that those controls were materially deficient.

39. Defendants failed to implement reasonable email and account-compromise safeguards. Modern ransomware and data-theft campaigns commonly begin with credential theft, phishing, account compromise, or abuse of trusted user access. Reasonable security in Defendants' environment required protective controls designed to prevent, detect, and respond to such compromise, including strong authentication, suspicious-login detection, malicious-email filtering, and workforce safeguards proportionate to the sensitivity of the data maintained. The compromise here supports the inference that such controls were absent, inadequate, poorly configured, or not effectively enforced.

40. Defendants failed to implement reasonable endpoint and host security controls on workstations, servers, and other devices connected to their network. In a properly secured healthcare environment, endpoint protections should detect malicious activity, block unauthorized execution, and alert security personnel before attackers can establish persistence, move laterally, or stage sensitive data for exfiltration. The success and duration of the attack support the inference that Defendants' endpoint defenses were not reasonably designed, tuned, staffed, or maintained to protect systems containing Class Members' Private Information.

41. Defendants failed to maintain a reasonably secure network architecture. The attack reached systems containing highly sensitive personal, financial, and medical data, which supports the inference that Defendants failed to adequately segment or isolate critical systems, failed to sufficiently separate administrative functions from user environments, failed to sufficiently compartmentalize repositories containing the most sensitive information, and failed to impose internal restrictions that would have prevented an intruder from moving through the environment and reaching files and systems containing Plaintiff's and Class Members' Private Information.

42. Defendants failed to implement reasonable data governance and data-minimization controls for the storage of highly sensitive data. The categories of compromised information and the reported scale of the event support the inference that Defendants stored highly sensitive information in a manner that was too broadly accessible within their environment,

retained sensitive files, reports, exports, or other repositories without sufficient restriction, and failed to segregate or otherwise protect especially sensitive data such as Social Security numbers, financial account information, and medical information.

43. Defendants failed to implement reasonable data protection and exfiltration safeguards. In an environment containing Social Security numbers, bank account data, medical information, and health insurance information, reasonable cybersecurity requires controls designed to detect and prevent unusual access, mass collection, compression, staging, transfer, or removal of sensitive data. Public reporting that attackers exfiltrated approximately 200,000 files supports the inference that Defendants lacked reasonable controls to detect, block, or contain large-scale unauthorized data access and egress.

44. Defendants failed to implement reasonable logging, monitoring, alerting, and escalation controls. Defendants disclosed that unauthorized actors had access to CHASI's network from October 31, 2025 through January 5, 2026, and that enhanced monitoring and alerting software was implemented only after the incident. That chronology supports the inference that Defendants' pre-breach logging, monitoring, and alerting capabilities were materially deficient and failed to timely identify, escalate, and stop unauthorized activity in systems containing highly sensitive data.

45. Defendants failed to maintain reasonable incident response and containment capabilities. A healthcare entity exercising reasonable care does not allow unauthorized actors to remain in its environment for more than two months while systems containing Social Security numbers, bank account information, medical information, and health insurance information are accessible. The prolonged duration of the intrusion supports the inference that Defendants failed to timely investigate alerts or suspicious activity, failed to isolate compromised accounts or systems, failed to contain attacker movement, and failed to expel the intruders before sensitive data was accessed and removed.

46. Defendants failed to implement and enforce cybersecurity governance commensurate with their obligations as healthcare entities. Sun River publicly represents that CHASI is part of the Sun River Health network and that its compliance program is designed to

ensure compliance with federal, state, and local healthcare laws and regulations, including obligations relating to patient privacy and confidentiality. Despite those representations and despite the well-known risk of ransomware and data theft targeting healthcare entities, Defendants failed to adopt, implement, test, and enforce safeguards reasonably sufficient to protect the highly sensitive information entrusted to them.

47. The Data Breach was therefore caused by Defendants' failure to implement reasonable and adequate cybersecurity safeguards, including failures in access control, external-system security, credential protection, endpoint security, network segmentation, sensitive-data restriction, exfiltration prevention, logging, monitoring, alerting, and incident response. Had Defendants implemented and enforced reasonable cybersecurity safeguards proportionate to the sensitivity of the data they maintained, the attack would have been prevented, detected materially sooner, contained before broad compromise, or substantially limited in scope and severity.

48. Defendants recognized their duty to provide reasonable data security for Plaintiff's and Class Members' Private Information that they collect and store as part of their business practices. Defendants made promises to do so in, *inter alia*, its public-facing Notice of Privacy Practices. Despite this, Defendants did not implement reasonable data security safeguards and protocols to protect Plaintiff's and Class Members' Private Information and instead allowed it to be disclosed to unauthorized third-party hackers without authorization or consent.

**C. Defendants' Obligation to Protect Patient Private Information**

49. Defendants owed Plaintiff and Class Members a duty to exercise reasonable care in collecting, storing, safeguarding, and protecting their Private Information from unauthorized access, acquisition, disclosure, and misuse. That duty arises from, among other things, Defendants' role as healthcare entities entrusted with highly sensitive personal and medical information, their public privacy commitments, the legal and regulatory obligations governing the protection of such information, and the foreseeability that inadequate cybersecurity safeguards would expose Plaintiff and Class Members to identity theft, financial fraud, medical identity theft, insurance fraud, invasion of privacy, and other serious harms. Given the nature of the information Defendants collected and maintained, including Social Security numbers, financial account

information, medical information, and health insurance information, and the well-known frequency with which healthcare entities are targeted by cybercriminals, the risk of unauthorized access and misuse was plainly foreseeable, thereby creating and reinforcing Defendants' duty to implement reasonable and adequate data security measures.

50. Under New York's Stop Hacks and Improve Electronic Data Security Act ("SHIELD Act"), businesses that own or license computerized data containing the private information of New York residents are required to "develop, implement and maintain reasonable safeguards to protect the security, confidentiality and integrity of the private information." N.Y. Gen. Bus. Law § 899-bb(2)(a).

51. Additionally, as a covered entity under the Health Insurance Portability and Accountability Act of 1996 (HIPAA), Pub. L. No. 104-191, 110 Stat. 1936, 45 C.F.R. § 160, et seq., Defendants hold a statutory duty under HIPAA and other federal and state statutes to safeguard Plaintiff's and Class Members' Private Information.

52. Under the HIPAA Security Rule, Defendants are required to:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by their workforce.

(45 C.F.R. § 164. 306 (a).)

53. The HIPAA Security Rule also requires Defendants to "review and modify the security measures implemented…as needed to continue provision of reasonable and appropriate protection of electronic protected health information" under 45 C.F.R. § 164.306(e) and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights" under 45 C.F.R. § 164.312 (a)(1).

54. Further, the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 prohibits Defendants from engaging in "unfair or deceptive acts or practices affecting commerce." The Federal Trade Commission ("FTC") has found that a company's failure to maintain reasonable and appropriate data security for the consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.* (3rd Cir. 2015) 799 F.3d 236, 243.

55. Defendants failed to comply with each of these state and federal statutes by failing to implement and maintain reasonable security procedures to protect Plaintiff's and Class Members' Private Information from unauthorized disclosure.

**D. Applicable Standards of Care**

56. In addition to their obligations under state and federal law, the applicable standard of care required Defendants to exercise reasonable care in obtaining, retaining, storing, securing, safeguarding, transmitting, and protecting the Private Information in Defendants' possession from unauthorized access, acquisition, disclosure, exfiltration, and misuse. Defendants were required to maintain safeguards commensurate with the sensitivity of the information Defendants collected and maintained, including Social Security numbers, bank account and routing numbers, medical information, and health insurance information.

57. The applicable standard of care required Defendants to implement, maintain, and regularly test reasonable administrative, technical, and physical safeguards designed to prevent unauthorized access to systems containing Private Information; to restrict access to such information to authorized persons with a legitimate business need; and to protect against reasonably foreseeable threats to the confidentiality, integrity, and availability of that information.

58. The applicable standard of care required Defendants to maintain reasonable identity and access controls, including controls sufficient to authenticate users, restrict privileges, govern administrative access, and prevent unauthorized users from reaching systems and repositories containing highly sensitive personal, financial, and medical information.

59. The applicable standard of care required Defendants to maintain reasonable logging, monitoring, alerting, and detection capabilities sufficient to identify suspicious activity,

unauthorized access, lateral movement, privilege misuse, unusual data access, and attempted or actual exfiltration of Private Information in a timely manner.

60. The applicable standard of care required Defendants to maintain reasonable network architecture and system-security controls, including measures sufficient to segment sensitive systems and data, limit internal access pathways, reduce the ability of an intruder to move through the environment, and protect files and databases containing the most sensitive categories of Private Information.

61. The applicable standard of care required Defendants to maintain reasonable data-governance and data-protection controls, including controls sufficient to limit unnecessary retention, restrict access to sensitive files and repositories, protect especially sensitive data from broad internal availability, and detect or prevent bulk access to or removal of Private Information.

62. The applicable standard of care required Defendants to provide reasonable and adequate cybersecurity training to employees, workforce members, and other personnel with access to systems containing Private Information, including training designed to reduce the risk of credential compromise, phishing-based intrusion, improper handling of sensitive data, and delayed escalation of suspicious activity or security incidents.

63. The applicable standard of care required Defendants to maintain reasonable incident-response and containment capabilities, including the ability to investigate suspicious activity promptly, isolate compromised accounts or systems, contain unauthorized access, and remediate security events before attackers could persist within the environment or access and remove large volumes of sensitive data.

64. The applicable standard of care required Defendants to review, assess, and modify their security measures as needed to address evolving threats, known risks facing healthcare institutions, and the particular risks associated with maintaining Social Security numbers, financial account information, medical information, and health insurance information.

65. The applicable standard of care required Defendants to disclose, in a timely and accurate manner, material facts concerning inadequacies in Defendants' data-security practices and the occurrence of a breach compromising Plaintiff's and Class Members' Private

Information, because such facts would be material to a reasonable patient's decision to entrust highly sensitive information to Defendants.

66. Defendants knew, or should have known, that healthcare entities maintaining Social Security numbers, banking information, medical information, and health insurance information are prime targets for cybercriminals and that failure to implement reasonable cybersecurity safeguards would foreseeably expose Plaintiff and Class Members to identity theft, financial fraud, medical identity theft, insurance fraud, invasion of privacy, and other substantial harms.

**E. The Value of the Stolen Private Information**

67. While the greater efficiency of electronic records translates to cost savings for entities such as Defendants, it also comes with the risk of privacy breaches. These electronic health records contain a plethora of sensitive information (e.g., patient data, patient diagnosis, lab results, medical prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, Private Information is a valuable commodity for which a "cyber black market" exists in which criminals openly post stolen payment card numbers, Social Security numbers and other personal information on a number of underground internet websites.

68. The high value of Private Information to criminals is further evidenced by the prices they will pay for them through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[3] Experian reports that a stolen

[3] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs*, DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/ (last visited Feb. 24, 2026).

credit or debit card number can sell for $5 to $110 on the dark web.[4] Criminals can also purchase access to entire company data breaches from $999 to $4,995.[5]

69. Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[6] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[7] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 % of overall health data breaches, according to cybersecurity firm Tenable.[8]

70. These criminal activities have and will result in devastating financial and personal losses to Plaintiff and Class Members. For example, it is believed that certain Private Information compromised in the 2017 Equifax data breach was being used three years later by identity thieves to apply for COVID-19-related benefits in the state of Oklahoma. Such fraud will be an omnipresent threat for Plaintiff and Class Members for the rest of their lives. They will need to remain constantly vigilant.

71. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or

---

[4] Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, EXPERIAN (June 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Feb. 24, 2026).

[5] *In the Dark*, VPNOVERVIEW, *https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/* (last visited Feb. 24, 2026).

[6] Adil Hussain Seh, et al., *Healthcare Data Breaches: Insights and Implications*, MDPI (May 13, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133 (last visited Feb. 24, 2026).

[7] Steve Alder, *December 2019 Healthcare Data Breach Report*, THE HIPAA JOURNAL (Jan. 21, 2020), https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/ (last visited Feb. 24, 2026).

[8] Rody Quinlan, *Healthcare Security: Ransomware Plays a Prominent Role in COVID-19 Era Breaches*, TENABLE (Mar. 10, 2021), https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-in-covid-19-era-breaches (last visited Feb. 24, 2026).

identification number, alien registration number, government passport number, employer or taxpayer identification number."

72. Identity thieves can use Private Information, such as that of Plaintiff and Class Members which Defendants failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as immigration fraud, obtaining a driver's license or identification card in the victim's name but with another's picture, using the victim's information to obtain government benefits or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

73. The ramifications of Defendants' failure to keep Plaintiff's and Class Members' Private Information secure are long-lasting and severe. Once Private Information is stolen, particularly identification numbers, fraudulent use of that information and damage to victims may continue for years. Indeed, Plaintiff's and Class Members' Private Information were taken by hackers to engage in identity theft or to sell it to other criminals who purchase the Private Information for that purpose. The fraudulent activity resulting from the Data Breach may not come to light for years.

74. There may be a time lag between when harm occurs versus when it is discovered and also between when Private Information are stolen and when they are used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[9]

---

[9] *Identity Theft and the Value of Your Personal Data*, TREND MICRO (Apr. 30, 2015), https://www.trendmicro.com/vinfo/us/security/news/online-privacy/identity-theft-and-the-value-of-your-personal-data (Feb. 24, 2026).

75. The harm to Plaintiff and Class Members is especially acute given the nature of the leaked data. Medical identity theft is one of the most common, most expensive and most difficult-to-prevent forms of identity theft. According to Kaiser Health News, "medical-related identity theft accounted for 43 percent of all identity thefts reported in the United States in 2013," which is more than identity thefts involving banking and finance, the government and the military, or education.[10]

76. "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[11]

77. When cybercriminals access financial information, healthcare and medical information and other personally sensitive data—as they did here—there is no limit to the amount of fraud to which Defendants may have exposed Plaintiff and Class Members.

78. A study by Experian found that the average total cost of medical identity theft is "about $20,000" per incident, and that a majority of victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[12] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third saw their insurance premiums rise, and 40% were never able to resolve their identity theft at all.[13]

---

[10] United States Government Accountability Office, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, REPORT TO CONGRESSIONAL REQUESTERS at 29 (June 2007), http://www.gao.gov/new.items/d07737.pdf

[11] *Id*.

[12] *See* Elinor Mills, *Study: Medical Identity Theft is Costly for Victims*, CNET (Mar. 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited Feb. 24, 2026).

[13] *Id*.; *see also* Louis DeNicola, *What Is Medical Identity Theft*, EXPERIAN (Jul. 26, 2024) https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited Feb. 24, 2026).

79. And data breaches are preventable.[14] As Lucy Thompson wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[15] She added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised."[16]

80. Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules and procedures. Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a *data breach never occurs*.[17]

81. Here, Defendants knew of the importance of safeguarding Private Information and of the foreseeable consequences that would occur if Plaintiff's and Class Members' Private Information was stolen, including the significant costs that would be placed on Plaintiff and Class Members as a result of a breach of this magnitude. As detailed above, Defendants knew or should have known that the development and use of such protocols were necessary to fulfill their statutory and common law duties to Plaintiff and Class Members. Its failure to do so is therefore intentional, willful, reckless and/or grossly negligent.

82. Defendants disregarded the rights of Plaintiff and Class Members by, *inter alia*, (i) intentionally, willfully, recklessly and/or negligently failing to take adequate and reasonable measures to ensure that their network servers were protected against unauthorized intrusions, (ii) failing to disclose that Defendants did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiff's and Class Members' Private Information, (iii) failing to take standard and reasonably available steps to prevent the Data Breach, (iv)

---

[14] Lucy Thompson, *Despite the Alarming Trends, Data Breaches Are Preventable*, in DATA BREACH AND ENCRYPTION HANDBOOK (2011).

[15] *Id.* at 17.

[16] *Id.* at 28.

[17] *Id.*

concealing the existence and extent of the Data Breach for an unreasonable duration of time, and (v) failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

**E. Plaintiff and Class Members Suffered Damages**

83. The unauthorized exposure of Plaintiff's and Class Members' Private Information was a direct and proximate result of Defendants' failure to properly safeguard and protect Plaintiff's and Class Members' Private Information from unauthorized access, use, and disclosure, as required by state and federal law.

84. Additionally, the Data Breach was also a result of Defendants' failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class Members' Private Information in order to protect against reasonably foreseeable threats to the security or integrity of such information, also required by their contracts and federal statute and regulation.

85. Plaintiff's and Class Members' Private Information is private and sensitive in nature and was inadequately protected by Defendants. Defendants did not obtain Plaintiff's and Class Members' consent to disclose their Private Information, as they promised to do and as required by applicable law and industry standards. As a result, Plaintiff and Class Members have been placed at an increased risk of credit and identity fraud, for which they must now spend increased time and effort to monitor their personal and financial accounts to prevent and mitigate the resulting misuse that will almost certainly occur.

86. As a direct and proximate result of Defendants' wrongful actions and inaction and the resulting Data Breach, Plaintiff and Class Members have lost the value of their Private Information. Private Information is a valuable commodity, as evidenced by numerous companies which purchase Private Information from consumers, such as UBDI, which allows its users to link applications like Spotify, Twitter, or Apple Health and opt-in to paid opportunities to earn income, and Brave, which uses a similar business model, and by market-based pricing data involving the sale of stolen Private Information across multiple different illicit websites.

87. Top10VPN, a secure network provider, has compiled pricing information for stolen PII, including $160.15 for online banking details, $35.00 for credit reports, and $62.61 for

passports. Standalone Yahoo email accounts have been listed for as little as $0.41, while banking logins are in the range of $500, and verified PayPal accounts with high balances are listed at as much as $2,000.

88. In addition, Privacy Affairs, a cyber security research firm, has listed the following prices for stolen PII:

| | |
|---|---|
| U.S. driving license, high quality: | $550 |
| Auto insurance card: | $70 |
| AAA emergency road service membership card: | $70 |
| Wells Fargo bank statement: | $25 |
| Wells Fargo bank statement with transactions: | $80 |
| Rutgers State University student ID: | $70 |

89. Additionally, Plaintiff also suffered actual economic injury in the form of the loss of the benefit of his bargain with Defendants and the overpayment for healthcare and related services. Plaintiff paid for services with the reasonable understanding that those services would be provided in a manner that included lawful, reasonable, and adequate protection of the extraordinarily sensitive personal, financial, and medical information Defendants required him to disclose as a condition of receiving care. The value of that bargain is measured by the difference between: (a) the value of the services as represented and reasonably expected, which included reasonable and adequate data-security safeguards; and (b) the value of the services actually received, which were worth less because Defendants failed to provide those safeguards and instead exposed Plaintiff's Private Information to unauthorized access, acquisition, and exfiltration. Plaintiff would not have paid the amount he paid, or would have paid less, had he known Defendants would fail to reasonably safeguard his Private Information.

90. Defendants' wrongful actions and inaction directly and proximately caused the unauthorized disclosure of Plaintiff's and Class Members' Private Information, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a. The improper disclosure of their Private Information;

b. Ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

c. Ascertainable losses in the form of deprivation of the value of their Private Information, for which there is a well-established national and international market; and

d. Ascertainable losses in the form of the lost benefit of Plaintiff and Class Members bargains with Defendants.

## CLASS ACTION ALLEGATIONS

91. Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and the following proposed Classes:

> <u>The "Nationwide Class":</u>
> All individuals whose Private Information was stored by Defendants and/or was exposed to unauthorized third parties as a result of the Data Breach.
>
> <u>The "New York Sub-Class":</u>
> All individuals domiciled in the State of New York whose Private Information was stored by Defendants and/or was exposed to unauthorized third parties as a result of the Data Breach.

92. Excluded from the Classes are Defendants; any parent, subsidiary, affiliate, or entity in which either Defendant has a controlling interest; Defendants' officers, directors, agents, legal representatives, successors, and assigns; the judges assigned to this case and their immediate family members; and any person who timely and validly requests exclusion from the Classes. Plaintiff reserves the right to amend or modify the Class definitions as discovery and further investigation may warrant.

93. *Numerosity*: The Class Members are so numerous that the joinder of all members is impractical. The disposition of the claims of Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable

from information and records in Defendants' possession, custody, or control, such as patient records.

94. *Commonality and Predominance*: There are questions of law and fact common to the Classes, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

i. Whether Defendants disclosed Plaintiff and Class Members Private Information, without authorization;

ii. Whether Defendants timely notified the patients whose information was wrongly disclosed;

iii. Whether Defendants' notice was deficient;

iv. Whether Defendants' conduct was negligent;

v. Whether Defendants knew or should have known that its data security systems, policies, procedures, and practices were vulnerable;

vi. Whether Plaintiff and Class Members suffered legally cognizable damages as a result of Defendants' conduct, including increased risk of identity theft and loss of value of their Private Information;

vii. Whether Defendants violated New York state consumer protection statutes;

viii. Whether Defendants were unjustly enriched by their conduct; and

ix. Whether Plaintiff and Class Members are entitled to equitable relief, including injunctive relief.

95. *Typicality*: Plaintiff's claims are typical of those of other Class Members because Plaintiff's Private Information, like that of every other Class Member, was maintained by Defendants, compromised in the same Data Breach, and exposed as a result of the same course of conduct by Defendants. Plaintiff and Class Members were injured by the same wrongful acts and omissions and assert the same legal theories.

96. *Adequacy of Representation*: Plaintiff will fairly and adequately represent and protect the interests of the Class Members. Plaintiff has retained competent counsel experienced

in litigation of class actions, including consumer and data breach class actions, and Plaintiff intends to prosecute this action vigorously. Plaintiff's claims are typical of the claims of other Class Members and Plaintiff has the same non-conflicting interests as the other Class Members. Therefore, the interests of the Class will be fairly and adequately represented by Plaintiff and his counsel.

97. *Superiority of Class Action*: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Classes is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action. Damages for any individual Class Member are likely insufficient to justify the cost of individual litigation so that, in the absence of class treatment, Defendants' violations of law inflicting substantial damages in the aggregate would go un-remedied.

98. Class certification is also appropriate because Defendants have acted or refused to act on grounds generally applicable to Class Members, such that final injunctive relief or corresponding declaratory relief is appropriate to the Classes as a whole.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Negligence**

**(On Behalf of the Nationwide Class)**

99. Plaintiff repeats and incorporates herein by reference each and every foregoing allegation of this Complaint as if set forth fully herein.

100. Defendants owed Plaintiff and Class Members a duty to exercise reasonable care in collecting, storing, securing, safeguarding, and protecting their Private Information from unauthorized access, acquisition, disclosure, exfiltration, and misuse. That duty arose from Defendants' custody of highly sensitive personal, financial, and medical information; Defendants' public privacy and confidentiality commitments; the legal and regulatory standards governing the protection of electronic protected health information and other sensitive personal

information; and the special relationship between Defendants, as healthcare providers and custodians of extraordinarily sensitive patient information, and Plaintiff and Class Members, who were required to entrust Defendants with that information in order to obtain care and related services. The duty was further created and reinforced by the obvious foreseeability of harm: healthcare entities that maintain Social Security numbers, financial account information, medical information, and health insurance information are well-known targets of cybercriminals, and it was readily foreseeable that inadequate cybersecurity safeguards would permit unauthorized access to that information and expose patients to identity theft, financial fraud, medical identity theft, insurance fraud, invasion of privacy, and other serious harms.

101. In 2016, the FTC updated its publication, "Protecting Personal Information: A Guide for Business," which establishes guidelines for fundamental data security principles and practices for business. [18] Among other things, the guidelines dictate businesses should protect any personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses implement an intrusion detection system to expose breaches as soon as they occur; monitor all incoming traffic for activity indicating someone is attempting to infiltrate or hack the system; monitor instances when large amounts of data are transmitted to or from the system; and have a response plan ready in the event of a breach. [19] Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures. [20]

---

[18] Federal Trade Commission, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personalinformation.pdf.

[19] *Id.*

[20] Federal Trade Commission, *Start With Security: A Guide for Business* (Jun. 2015) https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

102. Defendants owed Plaintiff and Class Members a duty of care in the handling of patients' Private Information. This duty included, but was not limited to, keeping that Private Information secure and preventing disclosure of the Private Information to any unauthorized third parties. This duty of care existed independently of Defendants' contractual duties to Plaintiff and Class Members. Under the FTC Guidelines, and other sources of industry-wide cybersecurity standards, Defendants are obligated to incorporate adequate measures to safeguard and protect Private Information that is entrusted to them in its ordinary course of business and transactions with customers.

103. Pursuant to the FTC Act (15 U. S. C. § 45), Defendants had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Private Information. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the businesses' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U. S. C. § 45. Orders from these actions further clarify the measures businesses are required to undertake to satisfy their data security obligations. [21]

104. Additional industry guidelines which provide a standard of care can be found in the National Institute of Standards and Technology's ("NIST") *Framework for Improving Critical Infrastructure Cybersecurity* (Apr. 16, 2018), https://nvlpubs. nist. gov/nistpubs/CSWP/ NIST. CSWP. 04162018. pdf. Among other guideposts, the NIST's framework identifies seven steps for establishing or improving a cybersecurity program (section 3. 2).

Those steps are:

> *Step 1: Prioritize and Scope*. The organization identifies its business/mission objectives and high-level organizational priorities. With this information, the organization makes strategic decisions regarding cybersecurity implementations and determines the scope of systems and assets that support the selected business line or process. The Framework can be adapted to support the different business

[21] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-securityenforcement.

> lines or processes within an organization, which may have different business needs and associated risk tolerance. Risk tolerances may be reflected in a target Implementation Tier.
>
> _Step 2: Orient_. Once the scope of the cybersecurity program has been determined for the business line or process, the organization identifies related systems and assets, regulatory requirements, and overall risk approach. The organization then consults sources to identify threats and vulnerabilities applicable to those systems and assets.
>
> _Step 3: Create a Current Profile_. The organization develops a Current Profile by indicating which Category and Subcategory outcomes from the Framework Core are currently being achieved. If an outcome is partially achieved, noting this fact will help support subsequent steps by providing baseline information.
>
> _Step 4: Conduct a Risk Assessment_. This assessment could be guided by the organization's overall risk management process or previous risk assessment activities. The organization analyzes the operational environment in order to discern the likelihood of a cybersecurity event and the impact that the event could have on the organization. It is important that organizations identify emerging risks and use cyber threat information from internal and external sources to gain a better understanding of the likelihood and impact of cybersecurity events.
>
> _Step 5: Create a Target Profile_. The organization creates a Target Profile that focuses on the assessment of the Framework Categories and Subcategories describing the organization's desired cybersecurity outcomes. Organizations also may develop their own additional Categories and Subcategories to account for unique organizational risks. The organization may also consider influences and requirements of external stakeholders such as sector entities, customers, and business partners when creating a Target Profile. The Target Profile should appropriately reflect criteria within the target Implementation Tier.
>
> _Step 6: Determine, Analyze, and Prioritize Gaps_. The organization compares the Current Profile and the Target Profile to determine gaps. Next, it creates a prioritized action plan to address gaps – reflecting mission drivers, costs and benefits, and risks – to achieve the outcomes in the Target Profile. The organization then determines resources, including funding and workforce, necessary to address the gaps. Using Profiles in this manner encourages the organization to make informed decisions about cybersecurity activities, supports risk management, and enables the organization to perform cost-effective, targeted improvements.
>
> _Step 7: Implement Action Plan_. The organization determines which actions to take to address the gaps, if any, identified in the previous step and then adjusts its current cybersecurity practices in order to achieve the Target Profile. For further guidance, the Framework identifies example Informative References regarding the Categories and Subcategories, but organizations should determine which standards, guidelines, and practices, including those that are sector specific, work best for their needs.

105. In addition to their obligations under federal regulations and industry standards, Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining,

retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems and networks, and the personnel responsible for them, adequately protected the Private Information of Plaintiff and Class Members.

106. Defendants owed a duty to Plaintiff and Class Members to design, maintain, and test its internal data systems to ensure that the Private Information in Defendants' possession was adequately secured and protected.

107. Defendants owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in their custodianship, including ensuring that their Private Information was not being disclosed without authorization to third-party hackers.

108. Defendants owed a duty to Plaintiff and Class Members to implement processes or safeguards that would detect an unauthorized disclosure of customer Private Information such as the Data Breach.

109. Defendants owed a duty to Plaintiff and Class Members to timely disclose if its computer systems and data security practices were inadequate to safeguard individuals' Private Information from unauthorized disclosure because such an inadequacy would be a material consideration in Plaintiff's and Class Members' decisions to entrust their Private Information to Defendants.

110. Defendants owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when data breaches occur.

111. Defendants owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices and systems. Defendants collected Private Information from Plaintiff and Class Members. Defendants knew that the unauthorized disclosure of Plaintiff's and Class Members' Private Information would cause them to incur damages.

112. The applicable standard of care required Defendants to implement, maintain, and enforce cybersecurity safeguards reasonably commensurate with the sensitivity of the information they collected and maintained, including safeguards sufficient to restrict access to sensitive systems and repositories, monitor for unauthorized activity, detect suspicious access in a timely manner, segment sensitive systems and data, protect against unauthorized exfiltration, train workforce members, and promptly contain and remediate security incidents.

113. Defendants breached their duties of care to safeguard and protect the Private Information entrusted to them by Plaintiff and Class Members. Defendants adopted inadequate safeguards to protect its Private Information from unauthorized disclosure and failed to adopt industry-wide standards set forth above in its supposed protection of the Private Information. Defendants failed to design, maintain, and test its computer system(s) to ensure that the Private Information was adequately secured and protected, failed to create and implement reasonable data security practices and procedures, failed to implement processes that would detect unauthorized disclosure, and otherwise breached each of the above duties of care by carelessly allowing unauthorized third parties to view, collect and exfiltrate Private Information, which led directly to the Data Breach.

114. Defendants breached those standards of care by, among other things, failing to maintain reasonable identity and access controls, failing to maintain reasonable monitoring, logging, and alerting capabilities, failing to maintain reasonable segmentation and internal access restrictions, failing to maintain reasonable controls to detect or prevent bulk access to and removal of sensitive data, failing to provide reasonable cybersecurity training to personnel, and failing to maintain reasonable incident-response and containment capabilities.

115. Defendants further breached the applicable standard of care by failing to implement safeguards reasonably sufficient to prevent unauthorized access to systems containing Plaintiff's and Class Members' Social Security numbers, bank account and routing numbers, medical information, and health insurance information; failing to detect the intrusion for more than two months; and failing to contain the compromise before unauthorized actors accessed and removed highly sensitive data.

116. Defendants breached the duties set forth in 15 U.S.C. § 45, the FTC guidelines, the NIST's Framework for Improving Critical Infrastructure Cybersecurity, and other industry guidelines. In violation of 15 U.S.C. §45, Defendants failed to implement proper data security procedures to adequately and reasonably protect Plaintiff's and Class Members' Private Information from unauthorized disclosure. In violation of the FTC guidelines, *inter alia*, Defendants did not protect the personal customer information that they were entrusted; lacked the requisite understanding of their own computer systems' vulnerabilities—including what Private Information that system disclosed to unauthorized third parties; and failed to implement policies to correct security problems. In violation of the NIST's Framework, Defendants, *inter alia*, failed to adopt sufficient resources to identify and address such security gaps.

117. The inadequacy of Defendants' safeguards is further reflected in Defendants' own post-incident actions, including their implementation of enhanced monitoring and alerting software and their offer of two years of identity theft protection and credit monitoring services to affected individuals.

118. Industry and regulatory guidance, including the HIPAA Security Rule and recognized cybersecurity frameworks and guidance, informed the reasonable safeguards Defendants were required to maintain under the circumstances and underscore the unreasonableness of Defendants' conduct as alleged herein.

119. As a direct and proximate result of Defendants' negligence, unauthorized actors gained access to, acquired, and exfiltrated Plaintiff's and Class Members' Private Information, thereby exposing them to a substantial, present, and imminent risk of identity theft, financial fraud, medical identity theft, insurance fraud, and invasion of privacy.

120. As a direct and proximate result of Defendants' failure to adequately protect and safeguard the Private Information, Plaintiff and Class Members suffered damages. Plaintiff and Class Members were damaged because their Private Information was accessed by unauthorized third-party hackers without any prior authorization. Plaintiff and Class Members have subsequently lost the value of their Private Information, as well as the benefit of their bargains with Defendants. Plaintiff and Class Members paid for healthcare and related services with the

reasonable understanding that those services would be provided in a manner that included lawful, reasonable, and adequate protection of the extraordinarily sensitive personal, financial, and medical information Defendants required them to disclose as a condition of receiving care. The value of that bargain is measured by the difference between: (a) the value of the healthcare and related services as represented and reasonably expected, which included the implementation and maintenance of reasonable data-security safeguards sufficient to protect Plaintiff's and Class Members' Private Information; and (b) the value of the healthcare and related services actually received, which were diminished because Defendants failed to provide those safeguards and instead exposed Plaintiff's and Class Members' Private Information to unauthorized access, acquisition, and exfiltration.

121. Plaintiff and Class Members have suffered actual injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

## SECOND CAUSE OF ACTION

**Breach of Implied Contract**

**(On Behalf of the Nationwide Class)**

122. Plaintiff repeats and incorporates herein by reference each and every foregoing allegation of this Complaint as if set forth fully herein.

123. Plaintiff and Class Members entered into agreements for services with Defendants. In making those agreements, Defendants solicited and invited Plaintiff and Class Members to provide their Private Information to Defendants as a requirement of receiving those healthcare and medical services. Plaintiff and Class Members accepted Defendants' offers and provided their Private Information to enter the agreements. Inherent within those agreements was an implied contractual obligation that Defendants would implement reasonable and adequate data security to safeguard and protect the Private Information entrusted to them by Plaintiff and Class Members from unauthorized disclosure.

124. Thus, when Plaintiff and Class Members provided their Private Information to Defendants in exchange for Defendants' services, they entered into implied contracts with

Defendants under which Defendants agreed to and were obligated to reasonably protect their Private Information from unauthorized disclosure. Plaintiff and Class Members provided payment to Defendant, as well as their Private Information, under the reasonable but mistaken belief that any money they paid to Defendants in connection to its provision of its services would be used in part to provide reasonable and adequate data security for their Private Information.

125. This implied contract is acknowledged and memorialized in Defendants' customer-facing documents, including, *inter alia*, Defendants' public-facing Notice of Privacy Practices, wherein they state: "Community Health Action of Staten Island protects your health information from inappropriate use and disclosure."[22]

126. Defendants require every patient to review their Notice of Privacy Practices prior to becoming a patient partaking in their services. Accordingly, the Notice of Privacy Practices and the privacy promises contained within are incorporated by reference into its contracts with its members, including Plaintiff and Class Members.

127. Despite these promises, Defendants did not provide reasonable and adequate data security for Plaintiff's and Class Members' Private Information and instead caused it to be disclosed to unauthorized third-party hackers. This was in direct contradiction to the promises Defendants made.

128. Defendants did not comply with state and federal statutes and regulations and did not comply with industry data security standards. In doing so, Defendants materially breached their obligations under implied contract.

129. That Defendants would implement such reasonable and adequate data security was a material prerequisite to the agreements between Plaintiff and Class Members. Reasonable consumers value the privacy of their Private Information, and do not enter into agreements for medical services with healthcare providers which are known not to protect customer data. Accordingly, Plaintiff and Class Members would not have entered into agreements with

[22] Notice of Privacy Practices - CHASI, https://chasiny.org/notice-of-privacy-practices/ (last visited Mar. 9, 2026).

Defendants and would not have provided them with their sensitive Private Information, had they known that Defendants would not implement such reasonable and adequate data security.

130. As a direct and proximate result of Defendants' breach, unauthorized actors gained access to, acquired, and exfiltrated Plaintiff's and Class Members' Private Information, thereby exposing them to a substantial, present, and imminent risk of identity theft, financial fraud, medical identity theft, insurance fraud, and invasion of privacy.

131. As a direct and proximate result of Defendants' failure to adequately protect and safeguard the Private Information, Plaintiff and Class Members suffered damages. Plaintiff and Class Members were damaged because their Private Information was accessed by unauthorized third-party hackers without any prior authorization. Plaintiff and Class Members have subsequently lost the value of their Private Information, as well as the benefit of their bargains with Defendants. Plaintiff and Class Members paid for healthcare and related services with the reasonable understanding that those services would be provided in a manner that included lawful, reasonable, and adequate protection of the extraordinarily sensitive personal, financial, and medical information Defendants required them to disclose as a condition of receiving care. The value of that bargain is measured by the difference between: (a) the value of the healthcare and related services as represented and reasonably expected, which included the implementation and maintenance of reasonable data-security safeguards sufficient to protect Plaintiff's and Class Members' Private Information; and (b) the value of the healthcare and related services actually received, which were diminished because Defendants failed to provide those safeguards and instead exposed Plaintiff's and Class Members' Private Information to unauthorized access, acquisition, and exfiltration.

132. Plaintiff and Class Members fully performed their obligations under the implied contract by providing their Private Information and making payments to Defendants.

133. Plaintiff and Class Members have suffered actual injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

## THIRD CAUSE OF ACTION

**Unjust Enrichment/Quasi-Contract**

**(Pled in the Alternative to Breach of Implied Contract and On Behalf of the Nationwide Class)**

134. Plaintiff repeats and incorporates herein by reference each and every foregoing allegation of this Complaint as if set forth fully herein.

135. This claim is pled in the alternative to Plaintiff's claim for breach of implied contract to the extent no enforceable contract is found to govern some or all of the parties' relationship or the subject matter of Defendants' obligations concerning the safeguarding of Private Information.

136. Plaintiff and Class Members provided their Private Information and conferred a monetary benefit upon Defendants in exchange for healthcare and medical services. Plaintiff and Class Members did so under the reasonable but mistaken belief that part of their monetary payment to Defendants would cover the implementation of reasonable, adequate, and statutorily mandated safeguards to protect their Private Information from unauthorized disclosure. Defendants were enriched when they sold their services at a higher price than they otherwise would have based on those reasonable but mistaken beliefs.

137. Defendants' enrichment came at the expense of Plaintiff and Class Members, who would not have paid for Defendants' services, or would have only been willing to pay substantially less for them, had they been aware that Defendants had not implemented reasonable, adequate and statutorily mandated safeguards to protect patient Private Information.

138. As a direct and proximate result of Defendants' wrongful actions and inactions, Plaintiff and Class Members have suffered damages in the form of their lost benefit of the bargains. Plaintiff and Class Members entered into agreements with Defendants under the reasonable but mistaken belief that it would reasonably and adequately protect their Private Information and would not have entered into such agreements had they known that Defendants would not reasonably and adequately protect their Private Information. Plaintiff and Class Members have thus suffered actual damages in an amount at least equal to the difference in value

between the medical services that include reasonable and adequate data security that they bargained for, and the medical services that do not and that they actually received.

139. Defendants should not be permitted to retain Plaintiff's and Class Members' lost benefits, without having adequately implemented the data privacy and security procedures for itself that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, and local laws and industry standards. Defendants should not be allowed to benefit at the expense of consumers who trusted Defendants to protect their Private Information that they were required to provide to Defendants in order to receive Defendants' services.

140. As a direct and proximate result of Defendants' wrongful actions and inactions, Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial but in excess of the minimum jurisdictional requirement of this Court.

## FOURTH CAUSE OF ACTION

**Invasion of Privacy**

**(On Behalf of the Nationwide Class)**

141. Plaintiff repeats and incorporates herein by reference each and every foregoing allegation of this Complaint as if set forth fully herein.

142. Plaintiff and Class Members had a reasonable and legitimate expectation of privacy in their Private Information, including their names, addresses, Social Security numbers, driver's license or non-driver identification numbers, bank account and routing numbers, medical information, health insurance information, and HIV testing information, all of which Defendants required them to provide and then collected, maintained, and stored in the course of providing healthcare and related services.

143. The Private Information compromised in the Data Breach concerned deeply personal, confidential, and private matters. Among the most sensitive categories of information exposed were medical information and HIV testing information, the unauthorized disclosure of which would be highly offensive, humiliating, and distressing to a reasonable person and would shock the conscience of any ordinary member of the public.

144. Plaintiff and Class Members provided this information to Defendants privately, with the expectation and understanding that it would remain confidential, would be used only for legitimate healthcare and related purposes, and would not be disclosed to unauthorized persons.

145. Defendants intentionally, recklessly, and/or with conscious disregard for Plaintiff's and Class Members' privacy interests failed to implement, maintain, and enforce reasonable safeguards necessary to prevent unauthorized persons from gaining access to and acquiring this information, despite knowing that the information was extraordinarily sensitive and that unauthorized disclosure would be highly offensive and harmful.

146. As a direct result of Defendants' acts and omissions, unauthorized actors intruded upon Plaintiff's and Class Members' private affairs and concerns by accessing, acquiring, and exfiltrating their Private Information, including HIV testing information and other confidential medical information.

147. The intrusion into Plaintiff's and Class Members' private affairs and the disclosure of their Private Information to unauthorized actors would be highly offensive to a reasonable person. The exposure of HIV testing information, medical information, Social Security numbers, and financial account information is the type of disclosure that would cause outrage, humiliation, distress, and serious concern in any reasonable person.

148. Defendants further publicized or exposed private facts concerning Plaintiff and Class Members by allowing highly confidential personal, financial, and medical information to be obtained by unauthorized actors for improper purposes, including misuse, sale, disclosure on the dark web and extortionate exploitation.

149. Defendants knew, or recklessly disregarded, that their inadequate data-security practices created an unreasonable and intolerable risk that Plaintiff's and Class Members' most sensitive personal, financial, and medical information would be exposed to unauthorized actors.

150. As a direct and proximate result of Defendants' invasion of Plaintiff's and Class Members' privacy, Plaintiff and Class Members suffered injury, including loss of privacy, loss of control over their Private Information, emotional distress and humiliation associated with the exposure of highly sensitive medical and HIV testing information, time and resources spent

responding to the Data Breach, and exposure to a substantial, present, and imminent risk of identity theft, financial fraud, medical identity theft, and other misuse of their information. Further, the sensitive information was placed for sale on the Dark Web.

151. Plaintiff and Class Members are therefore entitled to all damages and relief available under the applicable common law.

**FIFTH CAUSE OF ACTION**

**Violation of the New York Deceptive Practices Act, GBL § 349, *et seq*.**

**(On Behalf of the New York Sub-Class)**

152. Plaintiff repeats and incorporates herein by reference each and every foregoing allegation of this Complaint as if set forth fully herein.

153. The New York Deceptive Practices Act ("NYDPA"), GBL § 349, *et seq*., prohibits any "deceptive" business acts or practices and any false or misleading advertising, as defined by relevant case law. GBL § 349 declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce."

154. Defendants engaged in deceptive acts and practices in violation of GBL § 349 by misrepresenting and omitting material facts regarding the security and protection of Plaintiff's and Sub-Class Members' Private Information.

155. Defendants represented to patients and members of the public that they maintained appropriate safeguards to protect sensitive personal and medical information from unauthorized access, use, and disclosure. These representations were made through Defendants' privacy policies, Notices of Privacy Practices, patient communications, and other materials provided to consumers.

156. In those materials, Defendants represented that they protect patient information from inappropriate use and disclosure and maintain safeguards consistent with applicable legal requirements and industry standards.

157. These representations were materially misleading because Defendants failed to implement and maintain reasonable and adequate cybersecurity safeguards necessary to protect Plaintiff's and Sub-Class Members' Private Information from unauthorized access and disclosure.

158. Defendants also engaged in deceptive acts and practices by failing to disclose material facts known to them, including that their data-security systems and practices were inadequate to safeguard the extraordinarily sensitive information they collected and maintained, including Social Security numbers, financial account information, medical information (including HIV test records), and health insurance information.

159. Defendants knew or should have known that their data security practices exposed patients' Private Information to an unreasonable risk of unauthorized access but failed to disclose those material deficiencies to Plaintiff and Sub-Class Members.

160. Defendants' deceptive acts and practices were consumer-oriented because they were directed at patients and members of the public seeking healthcare services from Defendants and were part of Defendants' regular course of business affecting numerous consumers.

161. Defendants' misrepresentations and omissions were likely to mislead reasonable consumers. Reasonable patients expect that healthcare providers will implement and maintain reasonable safeguards to protect sensitive personal and medical information that patients must provide as a condition of receiving care.

162. Defendants' misrepresentations and omissions were material because the privacy and security of highly sensitive personal and medical information is a significant factor in a patient's decision to entrust that information to a healthcare provider.

163. As a direct and proximate result of Defendants' violations of GBL §349, Plaintiff and Sub-Class Members suffered injury, including but not limited to: 1) the loss of the value of their Private Information; 2) the loss of the benefit of their bargain with Defendants; 3) the time and expense incurred to monitor and mitigate risks resulting from the Data Breach; 4) exposure to a substantial and imminent risk of identity theft, financial fraud, medical identity theft, insurance fraud, 5) overpayment; 7) invasion of privacy and 8) the sensitive information was placed for sale on the Dark Web.

164. Plaintiff and Sub-Class Members are entitled to recover actual damages or statutory damages of fifty dollars ($50) per violation, whichever is greater, together with attorneys' fees and costs pursuant to GBL §349(h).

165. Plaintiff also brings this action to enjoin the unlawful acts and practices set forth herein.

## SIXTH CAUSE OF ACTION

**Violation of New York False Advertising Laws, GBL §350, *et seq*.**

**(On behalf New York Sub-Class)**

166. Plaintiff repeats and incorporates herein by reference each and every foregoing allegation of this Complaint as if set forth fully herein.

167. New York General Business Law §350 prohibits false advertising in the conduct of any business, trade, or commerce.

168. Defendants, in the course of marketing and providing healthcare and related services to consumers in New York, disseminated advertising and promotional statements representing that they maintained appropriate safeguards to protect sensitive personal and medical information from unauthorized access, use, and disclosure.

169. These representations were made in consumer-facing materials, including Defendants' publicly available privacy policies, Notices of Privacy Practices, patient-facing communications, website materials, and other statements directed to patients and prospective patients.

170. In those materials, Defendants represented, expressly or by necessary implication, that they protected patient information from inappropriate use and disclosure and maintained safeguards consistent with applicable legal requirements and industry standards.

171. These statements constituted advertising and promotion within the meaning of GBL §350 because they were directed to consumers for the purpose of inducing patients and prospective patients to use Defendants' healthcare and related services and to entrust Defendants with highly sensitive personal, financial, and medical information.

172. These advertising and promotional statements were false and misleading because, at the time Defendants made them, Defendants had not implemented and maintained reasonable and adequate cybersecurity safeguards sufficient to protect Plaintiff's and Sub-Class Members' Private Information from unauthorized access, acquisition, disclosure, and exfiltration.

173. Defendants knew or should have known that their representations concerning the security and protection of patient information were false or misleading because their data security systems and practices were inadequate to safeguard the extraordinarily sensitive information they collected and maintained, including Social Security numbers, financial account information, medical information, and health insurance information.

174. Defendants' false and misleading advertising was consumer-oriented and was likely to mislead reasonable consumers. Reasonable patients expect that healthcare providers advertising privacy, confidentiality, and appropriate data protection will in fact implement and maintain reasonable safeguards for the highly sensitive information patients must provide as a condition of receiving care.

175. Plaintiff and Sub-Class Members were materially misled by Defendants' false advertising and would not have provided their Private Information to Defendants, or would have paid less for Defendants' services, had they known that Defendants failed to maintain reasonable and adequate safeguards for that information.

176. As a direct and proximate result of Defendants' violations of GBL §350, Plaintiff and Sub-Class Members suffered injury, including but not limited to the loss of the value of their Private Information, the loss of the benefit of their bargain with Defendants, and the time and expense incurred to monitor and mitigate the risks arising from the Data Breach. Further, the sensitive information was placed for sale on the Dark Web.

177. Plaintiff and Sub-Class Members are entitled to recover actual damages or statutory damages of five hundred dollars ($500), whichever is greater, together with attorneys' fees and costs to the extent permitted by law.

178. Plaintiff also seeks injunctive and declaratory relief to prevent Defendants from continuing the false and misleading advertising described herein.

## SEVENTH CAUSE OF ACTION

**Violation of New York Public Health Law Article 27-F**

**(On behalf New York Sub-Class)**

179. Plaintiff repeats and incorporates herein by reference each and every foregoing allegation of this Complaint as if set forth fully herein.

180. New York Public Health Law Article 27-F governs HIV and AIDS-related information. Section 2782 provides that no person who obtains confidential HIV-related information in the course of providing any health or social service, or pursuant to a release of confidential HIV-related information, may disclose that information except as specifically authorized by the statute.

181. Plaintiff and members of the New York Sub-Class were patients of Defendants in New York and, in the course of receiving healthcare and related services, provided and/or had generated confidential HIV-related information, including HIV testing information and records reflecting HIV testing.

182. Defendants obtained, maintained, used, and stored that confidential HIV-related information in the course of providing healthcare and related services within the meaning of Article 27-F.

183. Defendants were therefore required by New York law to maintain the confidentiality of that HIV-related information and were prohibited from disclosing it except as permitted by Article 27-F.

184. Defendants violated Article 27-F by failing to maintain the confidentiality of Plaintiff's and the New York Sub-Class's confidential HIV-related information and by allowing unauthorized actors to access, acquire, and exfiltrate that information.

185. The disclosure and exposure of HIV testing information and related confidential medical information to unauthorized actors was not authorized by Plaintiff or the New York Sub-Class, was not permitted by Article 27-F, and occurred as a direct result of Defendants' failure to maintain lawful confidentiality protections for such information.

186. The HIV-related information exposed in the Data Breach is among the most personal, sensitive, and stigmatizing categories of medical information. Its unauthorized disclosure constitutes a grave invasion of privacy and creates serious risks of stigma, humiliation, emotional distress, and misuse.

187. As a direct and proximate result of Defendants' violation of Article 27-F, Plaintiff and the New York Sub-Class suffered injury, including loss of privacy, loss of control over confidential HIV-related information, emotional distress and humiliation, time and resources spent responding to the Data Breach, and exposure to additional risks associated with the unauthorized dissemination of highly sensitive medical information. Further, the sensitive information was placed for sale on the Dark Web.

188. Under New York Public Health Law § 2783, any person who discloses, compels the disclosure of, or procures the disclosure of confidential HIV-related information in violation of § 2782 is subject to a civil penalty, and any person who willfully commits such a violation is guilty of a misdemeanor. Plaintiff and the New York Sub-Class therefore seek all relief available under New York law arising from Defendants' violation of Article 27-F.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all of Class Members, respectfully requests that the Court enter judgment in his favor and against Defendants as follows:

1. For an Order certifying the Classes as defined herein and appointing Plaintiff and his Counsel to represent the Class;

2. For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete, and accurate disclosures to Plaintiff and Class Members;

3. For equitable relief compelling Defendants to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity to Class Members the type of Private Information compromised.

4. For an award of actual damages, statutory damages, and compensatory damages, in an amount to be determined at trial;

5. For an award of punitive and treble damages, in an amount to be determined at trial;

6. For an award of costs of suit, litigation expenses and attorneys' fees, as allowable by law; and

7. For such other and further relief as this Court may deem just and proper.

Dated: March 11, 2026

Respectfully submitted,

/s/ *Philip L. Fraietta*

Philip L. Fraietta (N.Y. Bar No. 5297825)
BURSOR & FISHER, P.A.
50 Main Street, Suite 475
White Plains, New York 10606
Telephone: (646) 837-7150
Email: *pfraietta@bursor.com*

Thiago M. Coelho*
**pro hac vice* forthcoming
WILSHIRE LAW FIRM, PLC
660 S. Figueroa Street, Sky Lobby
Los Angeles, California 90017
Telephone: (213) 381-9988
Facsimile: (213) 381-9989
Email: *Thiago.Coelho@wilshirelawfirm.com*
Email: *JeseniaMartinezsTeam@wilshirelawfirm.com*

**DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of himself and all others similarly situated, hereby demands a jury trial on all claims so triable.

Dated: March 11, 2026

Respectfully submitted,

/s/ *Philip L. Fraietta*

Philip L. Fraietta (N.Y. Bar No. 5297825)
BURSOR & FISHER, P.A.
50 Main Street, Suite 475
White Plains, New York 10606
Telephone: (646) 837-7150
Email: *pfraietta@bursor.com*

Thiago M. Coelho*
**pro hac vice* forthcoming
WILSHIRE LAW FIRM, PLC
660 S. Figueroa Street, Sky Lobby
Los Angeles, California 90017
Telephone: (213) 381-9988
Facsimile: (213) 381-9989
Email: *Thiago.Coelho@wilshirelawfirm.com*
Email: *JeseniaMartinezsTeam@wilshirelawfirm.com*